RAY v DEPARTMENT OF SOCIAL SERVICES

Docket No. 83097. Submitted March 17, 1986, at Detroit. Decided
November 4, 1986. Leave to appeal denied, 428 Mich —.

Anita Ray suffered injuries in a slip and fall accident at a
Department of Social Services office. She filed suit against the
Department of Social Services in the Court of Claims and
against Oakman Grand Associates, the lessors of the building
in which the DSS office was located, in Wayne Circuit Court,
alleging that the premises were allowed to become and remain
dangerous and unsafe. The cases were consolidated for trial in
the circuit court. A jury verdict of no cause of action was
rendered in favor of Oakman Grand Associates. The trial judge,
sitting as trier of fact on the issues concerning defendant DSS,
rendered a judgment against DSS in the amount of $64,007.62
plus costs, Edward M. Thomas, J. DSS appealed.

The Court of Appeals *held:*

1. The trial court did not err in ruling that the public
building exception to governmental immunity is applicable to
the facts of this case and that the requirements for notice set
forth in that statute were met.

2. The trial court did not abuse its discretion in allowing the
retired administrative manager of the DSS office to testify as to
dangerous and unsafe conditions existing at the DSS office even
though she was not included on plaintiff's witness list. DSS had

REFERENCES

Am Jur 2d, Damages §§ 86, 89 *et seq.*

Am Jur 2d, Judgments §§ 999 *et seq.*

Am Jur 2d, Municipal, School, and State Tort Liability § 150.

Validity and construction of statute or ordinance limiting the kinds
or amount of actual damages recoverable in tort action against
governmental unit. 43 ALR4th 19.

Sufficiency of evidence, in personal injury action, to prove impair-
ment of earning capacity and to warrant instructions to jury
thereon. 18 ALR3d 88.

Comment Note.—Municipal immunity from liability for torts. 60
ALR2d 1198.

See also the annotations in the Index to Annotations under Coun-
terclaim and Setoff.

notice of that person's potentiality as a witness because she had been listed as a witness in the Oakman Grand litigation.

3. The trial court's findings of fact as to the issue of defendant's liability were adequate and accurate.

4. The trial court did not err in refusing to offset against the judgment AFDC benefits received by plaintiff.

5. The trial court did err in granting medical expenses to plaintiff. The only medical expense plaintiff is entitled to is $200 which DSS did not pay.

6. The trial court apparently also mathematically erred in determining the amount plaintiff was entitled to for wages lost due to the injury. The amount, when correctly figured, must be reduced by any earnings actually received by the plaintiff during the period at issue and any other sums paid in lieu of wages, if any.

7. The case must be remanded for hearing and reconsideration by the court on the question of damages and for specific findings of fact as to dates plaintiff was employed and any moneys received in lieu of lost wages to be set off against the judgment awarded.

Affirmed in part and remanded.

1. TORTS — GOVERNMENTAL IMMUNITY — PUBLIC BUILDINGS.
    The defective public buildings exception to governmental immunity should not depend on whether the instrumentality causing an injury is a fixture or a structural part of a public building, but whether the injury occurred in a public place and whether such place was fit for its assigned and intended use (MCL 691.1406; MSA 3.996[106]).

2. TORTS — GOVERNMENTAL IMMUNITY — PUBLIC BUILDINGS.
    The standard of care and duty applicable to the operation of a department store or supermarket or privately owned place of business open to the public also applies to the operation of a governmental public building.

3. DAMAGES — SETOFF — TORTS — STATE LIABILITY — ADC BENEFITS.
    Federal and state funds expended for the benefit of a plaintiff's children cannot be set off against a tort judgment rendered in favor of the plaintiff against the state.

4. DAMAGES — EARNING CAPACITY — MEASURE OF DAMAGES.
    The measure of damages where a party's earning capacity has been impaired is not what he probably would have earned but rather what in absence of the disabling injury he could have earned in the future by pursuing any occupation he had held prior to the injury.

*Kepes & Wine, P.C.* (by *Kenneth D. Finegood*), for plaintiff.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *William R. Morris,* Assistant Attorney General, of Counsel, and *James E. Plastow, Jr.,* and *Robert D. Brignall,* Special Assistant Attorneys General, for defendant.

Before: R. M. MAHER, P.J., and CYNAR and T. GILLESPIE,* JJ.

T. GILLESPIE, J. This negligence action was brought by plaintiff, Anita Ray, for damages against the Michigan Department of Social Services and the Oakman Grand Associates, the lessors of the office space occupied by DSS in Detroit.

The action followed a slip and fall which occurred in August, 1979, while plaintiff was visiting the social services offices.

The plaintiff's claim against DSS was filed in the Court of Claims. This case was consolidated with the case filed against the Oakman Grand Associates, in Wayne Circuit Court.

The case against Oakman Grand was tried in early December, 1984, before a jury which returned a verdict of no cause of action.

The case against DSS was then tried in a bench trial before Recorder's Court Judge Edward Thomas, who was assigned to the circuit court.

In February, 1985, Judge Thomas entered a judgment against DSS in the amount of $64,007.62 and costs.

The Department of Social Services appeals. We affirm the finding of liability, but remand for further findings as to damages.

On August 23, 1979, the plaintiff accompanied

---

* Circuit judge, sitting on the Court of Appeals by assignment.

her sister-in-law, Argena Ray, to the offices of DSS in Detroit. She waited in the waiting room while Argena conducted her business.

Plaintiff testified that while in the waiting room she saw that the room was cluttered with cans, trash, papers, cigarette butts and food wrappers.

When Argena Ray had completed her business, she signaled Anita that she was going to the ladies' rest room. Plaintiff followed, and on the way to the rest room, slipped and fell, hitting her head, neck and back on the linoleum floor. Other persons in the waiting room helped her up. She sat in a chair for half an hour. During that time she was not approached by anyone from DSS, nor did she report the fall to them. She found that her clothing was wet on one side.

Later that day, she states, she became nauseated and her head hurt so much that she went to Detroit General Hospital. There x-rays were taken and she was given pain medicine and released. Upon her return home, she claims, she became dizzy and passed out. Upon regaining consciousness, she went to Henry Ford Hospital, where she received identical treatment as was given her at Detroit General.

She went to see an attorney on or about September 17, 1979. He referred her to Dr. Lawrence Weisman, who first treated her on that date.

About September 20, 1979, the plaintiff returned to DSS and informed DSS personnel of her injuries and requested financial assistance to pay for her medical treatment.

Dr. Weisman treated plaintiff until 1984. During the period in which he treated her, Dr. Weisman hospitalized plaintiff three times. His diagnosis was lower back strain and lumbar disc injury. His prognosis was that she could do the things necessary for daily living, but that she would be re-

stricted in bending and twisting and that she should not lift anything weighing more than ten pounds.

One of the issues on appeal was the condition of the waiting room. Calvert Bailey, District Manager of DSS, testified that he had overall responsibility for the upkeep of the offices, but had delegated that duty to an administrative service manager. He was aware of food being sold outside of the building from a food truck and stated that people were discouraged from bringing food into the building, but they were allowed to do so. Bailey did concede that he did not regularly observe the waiting room but believed it to be reasonably clean in August, 1979.

Also called as a witness by the plaintiff was Antoinette Underhill, who was the administrative manager of the Oakman Grand DSS office in 1979. Ms. Underhill had retired sometime after 1979.

The calling of Ms. Underhill caused the defendant to raise a spirited objection as her name was not on the plaintiff's witness list furnished to them. The court allowed Ms. Underhill to testify, reasoning that she was listed on the witness list of codefendant Oakman Grand and that defense counsel was aware of her existence and that she was a potential witness.

Ms. Underhill's testimony was that she had occasion to view the waiting room daily. She stated that in the late afternoon the waiting room would tend to be messy because the clients would go out to the truck and buy food and drinks and, instead of using the waste receptacles, they would drop the bottle, cans and trash on the floor.

There were, in August, 1979, approximately 250 to 500 people a day coming to the office.

Underhill also said that some nights the janitorial personnel provided by the building owner as

part of the lease would not show up. She testified that several spills had occurred in 1979 which were cleaned up by volunteers. Also, during that year, there was leakage after a rain by reason of a roof defect which caused water to form on the floor.

She further testified that she had complained to Bailey, her supervisor, and to the social services staff downtown. Underhill said she complained so bitterly that the condition became the subject of a picture and news story in the Detroit News.

As to the clients who threw food on the floor, Underhill testified: "I looked at it this way. It was their area. It was up to them to keep it clean if they wanted to sit in a clean place."

In October, 1979, the plaintiff testified that she went to work as a barmaid at a place known as the "Green Hat Lounge." She worked for four to five months earning $25 a day plus tips. She had not worked for some time prior to the accident as she wished to be with her children. At her last employment as a barmaid before the accident, she had earned $100 a week. Thus, her earnings after the accident represented nearly double that of her earnings prior to the accident.

There was some confusion as to how long she worked at the Green Hat Lounge. In her interrogatories plaintiff stated that she had been able to work for a year after the accident, but she then testified that it was only for a period of four or five months. She claimed she had to quit because her legs would swell and cause her pain. She has not worked since that employment and over the period has received approximately $22,000 in benefits from the defendant. The benefits were paid while she was working as well as after.

The issues are:

1. Whether the facts in this case fall within the

general rule of governmental immunity or does the building exception to governmental immunity, MCL 691.1406; MSA 3.996(106), apply.

2. Whether plaintiff gave defendant DSS the notice required to bring an action under the above-quoted statute and whether defendant had such advance notice of the defect as to establish a duty.

3. Whether the trial court's allowance of testimony from an undisclosed witness was erroneous.

4. Whether the trial court's findings of fact were clearly erroneous.

I

Do the facts in this case fall within the general rule of governmental immunity or does the building exception provision, MCL 691.1406; MSA 3.996(106), apply?

Generally, all governmental agencies shall be immune from tort liability in all cases wherein the governmental agency is engaged in the exercise or discharge of a governmental function. MCL 691.1407; MSA 3.996(107); *Ross v Consumers Power Co,* 420 Mich 567; 363 NW2d 641 (1984). MCL 691.1406; MSA 3.996(106) is an exception to this general immunity:

> Governmental agencies have the obligation to repair and maintain public buildings under their control when open for use by members of the public. Governmental agencies are liable for bodily injury and property damage resulting from a dangerous or defective condition of a public building if the governmental agency had actual or constructive knowledge of the defect and, for a reasonable time after acquiring knowledge, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition. Knowledge of the dangerous and defective condi-

tion of the public building and time to repair the same shall be conclusively presumed when such defect existed so as to be readily apparent to an ordinary observant person for a period of 90 days or longer before the injury took place. As a condition to any recovery for injuries sustained by reason of any dangerous or defective public building, the injured person, within 120 days from the time the injury occurred, shall serve a notice on the responsible governmental agency of the occurrence of the injury and the defect. The notice shall specify the exact location and nature of the defect, the injury sustained and the names of the witnesses known at the time by the claimant.

Defendant DSS argues that plaintiff did not plead a construction or design defect and that the public building exception was not intended to apply to a failure to clean up or isolate a wet spot on the floor of a public facility.

A panel of this Court stated in *Zawadzki v Taylor,* 70 Mich App 545, 551; 246 NW2d 161 (1976), that the "[t]hrust of the statute is to impose an obligation to 'repair and maintain public buildings,' viz.: to repair and maintain something that either was or should have been a structural part of the building."

In *Bush v Oscoda Area Schools,* 405 Mich 716; 275 NW2d 268 (1979), the Supreme Court held that the building must be safe for the use to which it is being put and imposes upon governmental agencies the duty and responsibility to maintain safe public places.

In *Davis v Detroit,* 149 Mich App 249; 386 NW2d 169 (1986), this Court held that a jail cell which was unpadded and which had open bars on which a prisoner could hang himself fell within the purview of the public building exception. The Court stated: "With the defective public building

exception, the Legislature intended to impose a broad duty on the government to maintain safe buildings." *Id.,* p 262.

In *Vargo v Svitchan,* 100 Mich App 809; 301 NW2d 1 (1980), this Court reviewed evolution of the case history of the public exception to governmental immunity in Michigan. That panel found that there had been a broadening of the application of the statutory exception. The early interpretation was that the injury must be sustained from a structural part of the building or a fixture attached thereto. The panel determined the current law to be as follows: "These cases make it clear that the exception to governmental immunity found in MCL 691.1406; MSA 3.996(106) is no longer to be governed by whether the instrumentality causing the injury was a fixture or structural part of the public building. Of concern now is whether the injury occurred in a 'public place' and whether that public place was fit for its assigned and intended use." *Id.,* p 821.

As we read the public building exception we find the words *"maintain"* and *"liability* for bodily injury or property damage resulting from a *dangerous* or *defective* condition." It appears that in the operation of a governmental public building it was the intent of the Legislature to apply the same standard of care and duty as would be applied to a department store or supermarket or a privately owned place of business open to the public. The difference is that the statute applying to public buildings specifically requires actual or constructive knowledge of the condition for ninety days prior to the injury before the onset of a conclusive presumption of negligence. There is the further requirement of specific notice as to the location of the defect, the injury sustained and names of witnesses. The statute does not require

that this notice be in writing, although it could be implied that it be in some sort of written form.

There was in this case a dangerous condition: dirty floors with periodic liquid spills and water from a leaking roof. Ms. Underhill, a responsible officer of DSS, knew of the dangerous condition and had informed her superiors of it more than ninety days prior to the injury. The condition of the office was apparently known widely enough to reach the ears of the press, which publicized it.

As to the specific notice of injury required by statute, the plaintiff went to the DSS office about twenty-eight days after the accident to bring her claim to the attention of responsible officials. Whether she filled out an incident report does not appear. The fact that the incident was reported was not disputed.

In *Whitmore v Sears, Roebuck & Co,* 89 Mich App 3; 279 NW2d 318 (1979), this Court discussed the duties of a storekeeper to prevent unsafe conditions. The factual situation of that case was different in that no knowledge of the dangerous condition was shown to have been had by the storekeeper. The case, however, is instructive on the questions of duties and notice in slip and fall cases.

We would find that the trial court did not err in ruling that this case did come within the public building exception to governmental immunity and that the requirements for notice set forth in that statute were met.

II

Defendant also argues that the trial court erred in allowing Antoinette Underhill, the retired administrative manager for the defendant, to testify when her name was not on plaintiff's witness list.

It is understandable that DSS would not want Ms. Underhill to testify as her testimony clearly proved prior notice by her and through her to her superiors of the dangerous and unsafe conditions.

Dss did have notice of the existence of Antoinette Underhill's potentiality as a witness as she was listed on the Oakman Grand witness list filed September 26, 1983, which was incorporated by reference in plaintiff's list in this action filed on October 21, 1983.

The trial court's decision to allow an unlisted witness to testify is a matter of discretion and is reviewed under an abuse of discretion standard. *Pollum v Borman's, Inc,* 149 Mich App 57; 385 NW2d 724 (1986).

We find no abuse here as the witness was listed.

III

The last objection raised by the defendant is that the trial court's findings of fact were erroneous and inaccurate.

As to the court's findings on liability, we have already indicted that we find the court's findings were adequate and accurate.

Defendant claims that the judgment should be reduced by moneys paid to plaintiff by Medicaid and AFDC.

The court was not in error by refusing to offset AFDC benefits against the judgment.

The judgment against the defendant in this case was awarded for personal injuries suffered by the plaintiff as a result of the negligence of the defendant. It does not make any sense that federal and state funds expended for the benefit of plaintiff's children may be claimed as an offset against a tort judgment. Such funds have their primary purpose for the protection of needy children. *Evans v Dep't*

*of Social Services,* 22 Mich App 633; 178 NW2d 173 (1970).

To the extent that DSS funds may have inured to the plaintiff's benefit, they cannot be said to have been in payment of the damage wrought by the defendant, but rather paid under the requirements of the statute.

Thus, the payments made would fall within the collateral source rule of funds received from an outside source even though the tortfeasor administratively made the payments. *Tebo v Havlik,* 418 Mich 350; 343 NW2d 181 (1984).

A different situation appears in the court's allowance of medical expenses. These medical expenses were paid by DSS except for $200 and under MCL 400.106(1)(b)(ii); MSA 16.490(16)(1)(b)(ii) a lien was retained by the defendant for such expense. There should be an offset against the judgment for such expenses and the plaintiff should recover only $200, the amount by which she was actually damaged.

We find that the court in its opinion made a flat finding of $7,280 per year for loss of "earning capacity" for five years, totalling $37,400. This finding was actually for lost wages due to the injury. We think there was a mathematical error as $7,280 per year for five years is $36,400. This amount should have been further reduced by the earnings actually received by the plaintiff during this period and any other sums paid in lieu of wages, if any.

As to the court's finding that plaintiff would be disabled for two further years, we cannot find that the court is mistaken in that view as the court had the opportunity to hear the testimony of the witnesses. Damages as to future earnings are measured by what plaintiff could have earned but for the disabling injury. *Prince v Lott,* 369 Mich 606;

120 NW2d 780 (1963); *Lorenz v Sowle,* 360 Mich 550; 104 NW2d 347 (1960); *Coger v Mackinaw Products Co,* 48 Mich App 113, 125; 210 NW2d 124 (1973).

We affirm as to liability, but remand for hearing and reconsideration by the court on the question of damages and for specific findings of fact as to dates plaintiff was employed and any moneys received in lieu of lost wages to be set off against the judgment awarded.

Affirmed in part and remanded.